# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| ZVI GUTTMAN, Litigation Trustee, | * |
| Appellant | * |
| v. | *   CIVIL NO. JKB-13-385 |
| CONSTRUCTION PROGRAM GROUP, | * |
| Appellee | * |
|  | * |
| In re RAILWORKS CORPORATION, | * |
| Debtor | * |

## MEMORANDUM

Appellant Zvi Guttman, Litigation Trustee for the Debtor, Railworks Corporation, appeals from the bankruptcy court's summary judgment for Appellee Construction Program Group ("CPG") in the Trustee's adversary proceeding against CPG for recovery of an avoidable preference.[1] The matter has been fully briefed (ECF Nos. 8, 13, 18), and no hearing is required, Local Rule 105.6 (D. Md. 2011). The bankruptcy court's judgment will be vacated and the case remanded for further proceedings.

*I. Background*

Railworks filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on September 20, 2001. Pursuant to the confirmed plan for reorganization, a

---

[1] The bankruptcy proceeding involved Railworks and 21 of its affiliates. In this opinion, they are referred to collectively as "Railworks" or the "Debtor."

litigation trust was created, and it included claims for recovery of avoidable transfers. (RA01521.)[2] One of those claims is at issue in this appeal.

Filed on September 16, 2003, the complaint sought to avoid several preferential transfers made by Railworks to CPG within the ninety days preceding the filing of the bankruptcy petition. The complaint alleged that CPG was a creditor of Railworks and that CPG received $2,178,041 in these transfers that "were to or for the benefit of the Defendant." (Bkr. Case No. 03-5363, ECF No. 1.) During the course of proceedings in the bankruptcy court, the Trustee reduced the amount sought to be recovered to $2,113,507, which represented four payments of insurance premiums by Railworks for various forms of insurance coverage. On appeal, the Trustee clarifies that the amount sought to be recovered from CPG is $1,585,130.25, which constitutes the amount of the contested transfers minus 25%; the 25% figure is comprised of commissions earned by CPG. (Appellant's Br. 5.)

The bankruptcy court rendered summary judgment for CPG, ruling that it was neither a creditor nor an entity for whose benefit the transfers were made and therefore not one from which the transfers could be recovered, denied summary judgment for the Trustee, and dismissed the complaint. (RA001518-59.) The Trustee has appealed. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(F), and this Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1).

## II. *Undisputed Facts*

CPG served as a managing general underwriter for TIG, the insurance company that provided general liability, automobile, and workers' compensation insurance coverage to Railworks. (RA01522-23.) CPG's predecessor in interest was Sherwood Insurance Services ("Sherwood") (Appellee's Br. 3-4), which was party to a General Agency Agreement

---

[2] "RA" refers to the Record Appendix.

2

("Agreement") with TIG. The Agreement was effective December 15, 1996. (RA00705-85, RA01523.) TIG sought to employ Sherwood's "expertise in soliciting, developing, marketing, underwriting, and issuing contracts of insurance." (RA00705, preamble.) One of Sherwood's contractual duties was "to collect, receive, and account for premiums on [p]olicies." (RA00705, Sec. I.2.b.) In Section Three of the Agreement, one of the "limitations of authority" of Sherwood was that it "shall not act as an insurer for any insureds, and this Agreement shall not be construed as an insurance policy or any contract or agreement of indemnity of insureds." (RA00706, Sec. III.4.)

In Section Five, Sherwood and TIG agreed that Sherwood "*shall be liable for and shall pay* to [TIG] all net premiums attributable to the [p]olicies produced hereunder, *whether or not such premiums have been collected* by [Sherwood] less [c]ommissions. . . ." (RA00709, Sec. V.1 (emphasis added).) Further, the Agreement specified that all premiums collected by Sherwood were TIG's property and were to be held in trust on TIG's behalf in an account segregated from Sherwood's operational funds and that after premiums were collected and deposited into the trust account, Sherwood could then deduct from the trust account its commission. (RA00709-10, Sec. V.2.) Finally, the parties agreed the Agreement was to be "governed by and construed in accordance with the laws of the State of Texas, without regard to its rules regarding conflict of laws." (RA00717, Sec. X.5.) At some point, CPG became Sherwood's successor in interest to the Agreement and the relationship formerly between Sherwood and TIG became one between CPG and TIG; apparently, the 1996 Agreement continued to govern this relationship.

From July 20 through August 17, 2001, Railworks issued four checks payable to CPG (RA00650, -657, -664, -671) as payments of insurance premiums for policies issued by TIG through CPG (RA01522-23). CPG deposited them into CPG's trust account and, after deducting

3

commissions due, remitted the net premiums to TIG (RA00970-72, Aff. Montero, Apr. 15, 2011). As earlier noted, Railworks's petition for reorganization was filed September 20, 2001, less than ninety days following the issuance and negotiation of these four checks.

### III. Standard of Review

On appeal, this Court reviews the bankruptcy court's legal determinations *de novo* and its factual findings for clear error. *In re Official Comm. of Unsecured for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006); *Rosen v. Kore Holdings, Inc. (In re Rood)*, 448 B.R 149, 157 (D. Md. 2011). Each cross-motion for summary judgment is viewed separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (citation omitted). Because the bankruptcy court granted CPG's motion for summary judgment, it made no factual findings with regard to CPG's motion. In denying the Trustee's motion for summary judgment, the bankruptcy court determined a genuine dispute existed as to a material fact.

### IV. Analysis

The Trustee argues that the transfers are avoidable under 11 U.S.C. § 547(b) and that they are recoverable from CPG under § 550(a). The Fourth Circuit has set forth its summary of the elements to be proven under § 547(b):

> Under 11 U.S.C. § 547(b), there are six elements that must be proved in order for a transfer to be set aside as preferential. The transfer must have been: (1) of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor before the transfer was made; (4) made while the debtor was insolvent; (5) made on or within ninety days of the filing of the bankruptcy petition; and (6) it must enable the creditor to receive a greater percentage of its claim than it would under the normal distributive provisions in a liquidation case under the Bankruptcy Code.

4

*In re Barefoot*, 952 F.2d 795, 798 (4th Cir. 1991).

The bankruptcy court clearly concluded that, out of the above six elements, the Trustee satisfied the first, third, fourth, and fifth elements. (RA01541-43.) Although the court below did not conclude that CPG was a creditor, it did conclude that TIG was a creditor, as conceded by CPG, and that TIG received the transfers through CPG. (RA01544.) Thus, it would have been correct for the bankruptcy court to conclude that the second element was established. The court did not rule one way or the other on the sixth element, but did note "the Trustee's deposition testimony to the effect that general unsecured creditors will receive far less that [*sic*] 100% of their claims." (RA01544.) No evidence in opposition to the Trustee's deposition testimony on that point was cited, allowing an inference it was unrefuted. Consequently, the evidence supports a conclusion that the Trustee proved the sixth element.

To be sure, the Trustee's complaint alleged that CPG was a creditor (Bkr. Dkt, ECF No. 1, ¶ 10), and the bankruptcy court seems to have analyzed the Trustee's motion for summary judgment only on that basis and not on whether the second element was satisfied by the undisputed proof that TIG was a creditor and received the transfers. However, it is well established in federal jurisprudence that a plaintiff is not held to a particular legal theory expressed in a complaint. Rather, under Federal Rule of Civil Procedure 8(a)(2), made applicable to bankruptcy adversary proceedings under Bankruptcy Rule 7008(a), a complaint need only set forth "a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (noting "a complaint need not pin plaintiff's claim for relief to a precise legal theory"). *See also New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24-25 (4th Cir. 1963) (plaintiff "need not set forth any theory or demand any particular relief for the court will award appropriate relief if the

plaintiff is entitled to it upon any theory"; "party's misconception of the legal theory of his case does not work a forfeiture of his legal rights"), *cited in Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 900 (4th Cir. 1996).

But even under the theory that CPG was a creditor of Railworks and received a benefit from the transfers, the evidence would support such a conclusion to establish the second element of § 547(b). In the Bankruptcy Code, a "creditor" is defined to include an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(1)(A). In turn, "claim" is defined as follows in pertinent part:

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

11 U.S.C. § 101(5)(A). *See In re Cybermech, Inc.*, 13 F.3d 818, 821 (4th Cir. 1994) (observing Bankruptcy Code's "broad definition of 'claim'").

The Agreement between CPG and TIG mandated that CPG "shall be liable for and shall pay" to TIG all premiums due whether or not CPG collects the premiums from insureds. The bankruptcy court stated without explanation that this language did not "make CPG a guarantor of Railworks for its payment of insurance premiums to TIG." (RA01551.) Whether this language creates a guaranty or other obligation on CPG must be decided in reference to Texas law. In the Texas Supreme Court's decision of *Langdeau v. Bouknight*, 344 S.W. 2d 435 (Tex. 1961), an insurance agent was held liable to an insurer's receiver for net premiums due based upon the agreement between the agent and the insurer. The agency agreement provided, "the agent shall not later than 60 days from the close of the month in which such policies were effective pay to the company the premiums thereon, whether such premiums have been collected or not less commissions." *Id.* at 46-47. This Court can discern no appreciable difference between the operative language in *Landeau*, found by the Texas Supreme Court to fix clear liability on the

agent for uncollected premiums on policies issued by the agent on behalf of the insurer, and the language at issue in the instant case.

CPG argues that this is not a proper interpretation of the Agreement because another section specifically provides that CPG "shall not act as an insurer for any insureds, and [the] Agreement shall not be construed as an insurance policy or any contract or agreement of indemnity of insureds." Sec. III.4. Thus, CPG effectively argues that this provision in the Agreement nullifies the liability imposed by section V.1 on CPG for payment of uncollected premiums. This argument is contrary to the governing Texas law on contract interpretation. "Texas law generally mandates that one contract provision not be interpreted in a way that nullifies another provision." *Greater Houston Radiation Oncology, P.A. v. Sadler Clinic Ass'n, P.A.*, 384 S.W.3d 875, 886 (Tex. App. 2012). Moreover, CPG's chosen interpretation of the Agreement is contrary to another basic principle of contract construction, which is, that a court must, if possible, harmonize the various provisions of a contract so that all provisions have meaning. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). It is possible to interpret both provisions at issue in harmonious fashion by recognizing that the liability for uncollected premiums imposed in section V.1 coexists with the overarching principle in section III.4 that CPG shall not act as an insurer and does not become an insurer of TIG's insureds simply by performing its work under the Agreement in arranging for and servicing their insurance policies. More specifically, CPG's duty to pay uncollected but due premiums to TIG is not inconsistent with the parties' recognition that CPG is not an insurance company. In addition, section III.4 seems, when read in its entirety, to be aimed at protecting CPG from being regarded as an insurance company and thereby not being held liable for failure to provide insurance coverage.

7

CPG further contends that section V.1 was only intended to act as an incentive to CPG to be diligent in collection of premiums and remittance of them to TIG. No doubt exists that CPG is correct on that point. Certainly, imposing liability for remittance of uncollected premiums serves that function and is consistent with CPG's averred intent. But such an intent does not modify or negate the plain language "shall be liable for and shall pay." Texas courts "give the contract terms their plain and generally accepted meaning unless the contract shows the parties intended to use them in another manner." *Greater Houston Radiation Oncology*, 384 S.W.3d at 883. The Agreement does not show the parties intended this language to mean something different from what it says. A reasonable person would understand the words "shall be liable for and shall pay" as meaning just that. *Id.* ("We will determine how a reasonable person would have understood the contract language, keeping in mind the circumstances surrounding the contract's negotiation and the parties' intended purpose in executing the agreement."). This plain meaning is especially compelling, and therefore reasonable, given the use of the language in a contract by parties who are presumed aware of its governing law, including the *Landeau* decision.

Having established CPG's liability to TIG for uncollected but due premiums, the Court next determines whether CPG is a creditor of Railworks within the meaning of the Bankruptcy code, *i.e.*, whether CPG has a claim against Railworks. CPG's liability for uncollected premiums was contingent upon Railworks's failure to pay them. Had Railworks not paid the premiums, CPG would have been required to pay them to TIG anyway. In turn, CPG would have acquired a cause of action under Maryland law[3] against Railworks for reimbursement. *See, e.g., Fireman's Fund Ins. Co. v. Continental Ins. Co.*, 519 A.2d 202, 319 (Md. 1987) (discussing

---

[3] Although Texas law provides the rule of decision in interpreting the Agreement, CPG's potential causes of action against Railworks arise outside the Agreement and are not governed by Texas law but by Maryland law, being the law of the forum state.

8

doctrine of equitable subrogation); *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of School Comm'rs*, 843 A.2d 252 (Md. Ct. Spec. App. 2004) (expounding on differences between various "legal" and "equitable" causes of action). Thus, given the broad definition of "claim" in the Bankruptcy Code, CPG would have a "claim" against Railworks and would fit the applicable definition of "creditor."

Likewise, CPG received a benefit from the transfers by being relieved of its contingent liability to pay uncollected premiums. The bankruptcy court was of the view that CPG's contingent liability for uncollected premiums was a moot point because the premiums were, in fact, received from Railworks and remitted to TIG. (RA01551.) But the nature of contingent liability is the possibility it will be imposed. In this case, CPG's contingent liability for uncollected premiums definitely existed, and it ceased to exist only because of transfers occurring during the ninety-day preference period. Consequently, it may be concluded that the transfers were for the benefit of CPG, satisfying the second element.

Therefore, different ways are available to meet the second element of § 547(b): one, TIG as an undisputed creditor received the transfers; and two, CPG, a creditor in possession of a contingent claim, received a benefit from the transfers. Having determined that the Trustee has established all six elements of § 547(b) and that the four transfers are avoidable, it is next necessary to decide from whom the Trustee may recover the transfers under § 550(a)(1). *See In re Harbour*, 845 F.2d 1254, 1255-56 (4th Cir. 1988) (noting legislative history recognizing separation between avoidance of transfers and recovery of avoided transfers).

Section 550(a)(1) permits recovery of an avoided transfer from either the initial transferee or the entity for whose benefit the transfer was made. A fair portion of the bankruptcy court's opinion was devoted to determining whether CPG was the initial transferee of the premium payments, concluding it was not because CPG served as a "mere conduit" of the premiums from

9

Railworks to TIG, with TIG being deemed the initial transferee. The Trustee does not take issue with that particular determination but argues that the bankruptcy court's conclusion on that point does not end the matter since it leaves the second alternative for recovery under § 550(a)(1) unresolved. This Court agrees. It is reasonable to conclude that CPG occupied a dual status, both as a "mere conduit" of money between Railworks and TIG and as one for whose benefit the transfer occurred. Such conclusion is not at odds with the Fourth Circuit's observation that the same entity cannot be both an initial transferee and a "mere conduit." *In re Southeast Hotel Props. Ltd. P'ship*, 99 F.3d 151, 155 (4th Cir. 1996). The undisputed fact is that the transfers were made to a creditor, TIG, and therefore avoidable under § 547(b). Furthermore, under Texas law, CPG was contingently liable to TIG for Railworks's premiums, and that contingent liability was extinguished when the premiums were paid to TIG. A recognized basis for concluding that an entity benefited from an avoidable transfer is the extinguishment of contingent liability. *See, e.g., In re Meredith*, 527 F.3d 372, 375 (4th Cir. 2008) (describing entity for whose benefit transfer was made as "'someone who receives the benefit but not the money'"). Thus, CPG is an entity for whose benefit the avoided transfers were made, and the Trustee is entitled under § 550(a)(1) to recover the net premiums from CPG.

The Court notes that the bankruptcy court declined to grant the Trustee's motion for summary judgment because, in that court's view, a dispute of material fact existed as to whether CPG was Railworks's creditor. (RA01545.) The undersigned is unable to find a genuine dispute of material fact on this point. Regardless, the matter need not be resolved because TIG clearly was a creditor and avoidance under § 547(b) may properly rest on that basis. On another, unrelated point, the bankruptcy court properly disregarded "expert testimony" on the meaning of section V.1 in the Agreement because its interpretation is a question of law. *Forrest Creek Associates, Ltd. v. McLean Sav. and Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987). Finally,

because the bankruptcy court denied summary judgment to the Trustee, it did not reach the question of whether CPG has a viable affirmative defense under 11 U.S.C. § 547(c), which places limitations on the Trustee's ability to avoid transfers, or otherwise. Even so, the bankruptcy court ruled that the transfers were for significantly past-due debts and "that they were neither contemporaneous exchanges for new value, nor were they made in the ordinary course of business." (RA01542-43.) That ruling would seem to reflect negatively on some of CPG's affirmative defenses.

## *V. Conclusion*

By separate order, the bankruptcy court's judgment will be vacated and the case remanded for further proceedings consistent with this opinion.

DATED this  8  day of July, 2013.

BY THE COURT:

_____
James K. Bredar
United States District Judge
